**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

DESTINY M. THURMAN,

               Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,[1]

             Defendant.

No.  17-CV-0035-LRR

**REPORT AND RECOMMENDATION**

_____

     Plaintiff Destiny M. Thurman seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Thurman argues that the administrative law judge (ALJ), John E. Sandbothe, erred in assessing Thurman's subjective complaints and in weighing medical opinions, and that some medical evidence does not support the ALJ's residual functional capacity (RFC) determination.  I recommend **affirming** the ALJ's decision.

## I.     BACKGROUND [2]

     Thurman protectively filed an application for SSI benefits on November 15, 2013,

---

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security, although she still leads that agency as the Deputy Commissioner.  *See Edwards v. Comm'r of Soc. Sec*, No. 7:17-CV-00052-RN, 2018 WL 1413974, at *1 n.1 (E.D.N.C. Mar. 21, 2018).  I substitute the Commissioner of Social Security for Ms. Berryhill in accordance with Federal Rules of Civil Procedure 17(d) and 25(d).  *See also, e.g.*, *Gates v. Comm'r, Soc. Sec. Admin.*, 721 F. App'x 575 (8th Cir. 2018) (per curiam); *Stanley v. Comm'r, Soc. Sec. Admin.*, 720 F. App'x 818 (8th Cir. 2018) (per curiam); *Shelton v. Comm'r, Soc. Sec. Admin*, 716 F. App'x 574 (8th Cir. 2018) (per curiam).

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 14).

alleging disability due to anxiety and bipolar disorder. AR 64, 157, 161.[3] Thurman described experiencing severe panic attacks and difficulty being in public places and around unfamiliar people. AR 177. She has five children (ages 22, 19, 15, 14, and 4 at the time of the administrative hearing in 2015), and she lives with her four youngest children. AR 39, 56. Thurman graduated from high school and attended some college. AR 38-39, 162. She has no significant work history, having worked only as a part-time kitchen aide in 2004, as a temporary worker in 2006, and as a telemarketer for a few months in 2007. AR 37, 45, 167-70.

Thurman's application was denied initially in January 2014 and on reconsideration in April 2014. AR 64-84. As part of those reviews, state agency consultants from the Iowa Disability Determination Service (DDS) assessed Thurman's mental impairments: Russell Lark, Ph.D, completed an initial assessment regarding the severity of Thurman's impairments (but made no RFC assessment) on January 16, 2014, and Scott Shafer, Ph.D, completed a review (including a mental RFC assessment) on April 24, 2014. AR 67-68, 70, 78-82, 84. There were no other medical opinions in evidence for either the initial or reconsideration reviews. AR 65-66, 74-76.

Thurman requested a hearing before an ALJ, and a video hearing was held on October 29, 2015. AR 35, 98. Thurman alleged a disability onset date of April 25, 2005, when she was 29 years old; she was 40 years old at the time of the administrative hearing. AR 35, 38, 64. The relevant time period, based on Thurman's prior application, runs from December 5, 2012. AR 11, 65. Both she and vocational expert (VE) Randall Harding testified at the administrative hearing. AR 35-36, 236. The record also included medical source statements from Thurman's psychiatrist, Keri Husman, MD, and her therapist, Joan Tatarka, MSW, LISW (both from Cedar Centre Psychiatric Group). AR 373-86. The ALJ issued a written opinion on December 29, 2015, following the familiar

---

[3] "AR" refers to the administrative record below, filed at Docs. 8-1 to 8-7.

2

five-step process outlined in the regulations[4] for determining whether Thurman was disabled. AR 11-21. The ALJ found that Thurman suffers from severe impairments of bipolar affective disorder, anxiety disorder, and obsessive compulsive disorder (OCD), but that none of her impairments meets or equals a listed impairment. AR 13-15. In evaluating whether these impairments prevented Thurman from performing work (at steps four and five), the ALJ determined Thurman's RFC[5] and found that she could perform work at all exertional levels but "only simple, routine, and repetitive work . . . at no production rate pace" and with "only occasional [contact] with coworkers and no contact with the public." AR 15. In determining Thurman's RFC, the ALJ considered, among other factors, the opinions of Dr. Husman, Therapist Tatarka, and the DDS non-examining consultants (Drs. Lark and Shafer). AR 19. The ALJ declined to give great weight to the opinions of Dr. Husman and Therapist Tatarka and gave substantial weight to the DDS consultants' opinions. *Id*. The ALJ also considered Thurman's statements about the intensity, persistence, and limitations of her symptoms, but found they were not substantiated by the record and were not fully credible. AR 16-19. The ALJ found that Thurman had no past relevant work but that she could perform other jobs, such as a laundry worker, cleaner, and router. AR 20-21.

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. § 416.920(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[5] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

3

The Appeals Council denied Thurman's request for review on February 9, 2017 (AR 1-4), making the ALJ's decision that Thurman is not disabled the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. The Appeals Council admitted additional medical records (from Mercy Medical Center and Cedar Centre Psychiatric Group) into the record. AR 2, 6, 428-38. Thurman filed a timely complaint in this court (Doc. 3). *See* 20 C.F.R. § 422.210(c). The parties briefed the issues (Docs. 11, 15), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.  DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Thurman argues that the ALJ erred in evaluating Thurman's subjective complaints and in weighing the medical opinions. Thurman argues these errors resulted in an RFC determination that is not supported by some medical evidence. As a result, Thurman argues the ALJ's opinion is not supported by substantial evidence. I address each of these arguments in turn.

### A.  Evaluation of Thurman's Subjective Complaints

Thurman argues the ALJ erred by discounting her subjective complaints without properly citing to how these complaints were inconsistent with the overall record. Doc.

4

11 at 25-27. In particular, Thurman takes issue with the ALJ not fully crediting her reports of having at least two panic attacks per week and staying home because of fear at least three days per week.[6] When evaluating a claimant's subjective complaints—including nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[7] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest a credibility finding on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). The court defers to an ALJ's assessment of a claimant's subjective complaints so long as the "determination is 'supported by good reasons and substantial evidence,' 'even if every factor is not discussed in depth.'" *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014).

---

[6] Thurman does not appear to challenge the ALJ's assessment of her ability to pay attention, concentrate, and follow instructions, and the record supports the ALJ's finding that she does not have significant limitations in these areas (other than as accounted for in the ALJ's RFC determination). *See* AR 80-81 (Dr. Shafer's RFC determination); AR 158, 182, 187, 387-88, 390, 432, 435, 437 (no apparent issues noted in treatment records); AR 351-53, 357, 361, 391-92, 394, 396, 398, 400, 402, 404, 406, 408, 411, 413, 414, 417, 433, 434, 436, 438 (able to sit through therapy sessions lasting approximately one hour); *but see* AR 199, 417, 208 (issues with concentration or focusing on the present).

[7] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

5

"The ALJ [i]s not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ in this case listed the *Polaski* factors and provided analysis for his assessment of Thurman's subjective complaints. AR 16-19. The ALJ found that the medical evidence did not support Thurman's claims because she often reported she was doing well, mental status exams showed some anxiety but no cognitive problems, and her Global Assessment of Functioning (GAF) scores consistently showed no more than moderate symptoms. AR 17-18. Treatment records generally provide support that Thurman's anxiety is not as severe as she claims. *See* AR 357, 361, 396, 411, 413, 414, 417 (2014 and 2015 treatment notes that Thurman is able to calm herself down and that self-talk, advance planning, and exercise help her symptoms); AR 395 (able to control panic attacks and anxiety for the most part in March 2015); AR 403 (panic attacks and anxiety under control with medication in January 2014). These records are consistent with Thurman's testimony that medication, self-talk, and advance planning or being aware of what will happen help reduce or alleviate her symptoms. AR 49-50. Treatment records also demonstrate that although Thurman experiences stress, she is able to control her reaction and function appropriately. *See* AR 389, 392 (able to transition to new psychiatrist); AR 391 (able to complete Housing and Urban Development (HUD) home inspection); AR 400 (able to drop clothes off at donation center); AR 436 (able to attend son's football game).

Treatment notes also show that Thurman's GAF scores were consistently in the range of only limited to moderate symptoms and improved over time: Therapist Tatarka noted GAF scores of 58 in December 2013 and 62 in July 2015 (AR 352, 380), while Dr. Husman noted a GAF score of 62 in May and June 2015, a score of 63 in July, August, and September 2015, and a score of 64 in November 2015 (AR 387-88, 390, 432, 435, 437). *See Partee v. Astrue*, 638 F.3d 860, 862 (8th Cir. 2011) (noting in

6

background section that a GAF score between 55 and 65 indicates mild to moderate mental impairment); *Halverson v. Astrue*, 600 F.3d 922, 925 n.4 (8th Cir. 2010) (GAF scores of 51 through 60 are characterized by moderate symptoms, such as occasional panic attacks or moderate difficulty in social functioning (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) (DSM-IV)). An ALJ may consider a GAF-score range reflecting only moderate symptoms when evaluating a claimant's subjective complaints. *See Lundgren v. Astrue*, No. 09-3395 (RHK/LIB), 2011 WL 882084, at *13 (D. Minn. Feb. 7, 2011) (report and recommendation), *adopted by* 2011 WL 883094 (D. Minn. Mar. 11, 2011); *see also Halverson*, 600 F.3d at 931 ("GAF scores may . . . be used to assist the ALJ in assessing the level of a claimant's functioning.").

The ALJ also discussed inconsistencies between Thurman's subjective complaints and her activities of daily living as well as her prior reports of limitations. AR 17-18. Thurman reported that although she avoids going out, being around crowds, and unfamiliar places, she is able to drive (including school drop-offs and pick-ups for her children and taking her older son to sport practices), go shopping, and talk with family and friends by phone or in person on a daily basis. AR 40, 52, 54, 180-81, 194, 197-98, 206-07, 414; *but see* AR 191 (reported being limited to driving regular, familiar routes and avoiding stores when they are busy). She has also been able to take her son outside to ride his bike and to the park to play. AR 413, 417. In addition, Thurman reported that although her mental health issues affect her ability to get along with others (AR 182), she does not have any issues getting along with authority figures (AR 183, 200, 209). She testified that she does not do well being around males but that she trusts her male attorney because he is "an authoritative figure" and she knows he will not harm her. AR 46-47. Overall, the record supports the ALJ's finding that Thurman's activities of daily living show that her subjective complaints were not fully credible.

7

The ALJ also noted that Thurman's sporadic work history "raises some questions as to whether the current unemployment is truly the result of medical problems."  AR 19.  An ALJ may properly consider this factor in weighing a claimant's subjective complaints.  *See Wildman v. Astrue*, 596 F.3d 959, 968-69 (8th Cir. 2010); *see also Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016).  Thurman has never worked long enough to have engaged in substantial gainful activity.  AR 37, 45, 167-70.  The record supports the ALJ's finding that this factor undermined Thurman's subjective complaints.  *See Julin*, 826 F.3d at 1087 (claimant's "poor employment history suggested a lack of motivation to work" and provided proper basis for ALJ to conclude unemployment may not be result of medical impairments).[8]

The ALJ did not completely disregard Thurman's reported limitations.  The ALJ found that Thurman does not handle stress or changes in routines well.  AR 17.  After considering the effects of Thurman's mental impairments, the ALJ limited Thurman to unskilled work that requires only limited contact with others.  AR 18.  Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"  *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)); *see also Halverson*, 600 F.3d at 932 (noting the ALJ weighed the *Polaski* factors in finding claimant's allegations were not fully credible).  Although the record shows that Thurman's mental impairments cause some limitations, the ALJ could only find Thurman

---

[8] Similarly, I note that in November 2013, Thurman told her treating psychiatrist at the time (R. Paul Penningroth, M.D.) that "[Thurman's] counselor wants her to get psychotherapy and this is necessary for her to get disability."  AR 333.  A claimant seeking treatment in support of a disability claim may be one factor, among others, that an ALJ can consider in evaluating a claimant's subjective complaints.  *See Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) (substantial evidence supported the weight the ALJ assigned to the claimant's subjective complaints when the ALJ considered, as one factor among many, that the claimant "seemed to return to the doctors only when she needed disability forms filled out").

disabled if her anxiety was so severe that it prevented her from working. Because the ALJ in this case provided good reasons for not fully crediting Thurman's subjective complaints, his assessment should be affirmed.

## B.    Weight Given to Medical Opinions

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." 20 C.F.R. § 416.927(b).[9]    In determining Thurman's RFC, the ALJ considered medical source statements[10] from Dr. Husman (AR 373-79) and Therapist Tatarka (AR 380-86). AR 19. Thurman argues[11] that the ALJ should have given Dr. Husman's opinion controlling weight because it is

---

[9] New regulations for evaluating medical opinions went into effect on March 27, 2017, and some, by their terms, apply retroactively. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The Eighth Circuit has applied these new rules retroactively, which are substantively the same as the old rules. *See, e.g.*, *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017). I cite only to the new regulations, except I cite to both the regulations currently in effect and in effect at the time of the ALJ's decision where the relevant section number differs between the 2018 and 2015 regulations.

[10] It is not completely clear at times which medical opinion(s) the ALJ is referring to in his written decision. He refers to the medical source statements from Thurman's "treating psychiatrist and licensed social worker" (which appear to be Dr. Husman and Therapist Tatarka based on reference to Exhibits 9F and10F), as well as "the Iowa Department of Human Services 'Report on Incapacity' forms (Exhibit 12F)" (which included forms from both Therapist Tatarka and Dr. Penningroth). AR 19, 373-86, 418-27. The ALJ then wrote "the proivder's [sic] opinions are without substantial support from the other evidence of record, including his own longitudinal treatment history" as one of multiple factors for not giving "these opinions" great weight. AR 19. Based on context, it appears the ALJ considered each of the medical source opinions and declined to give any of them great weight for the reasons stated. Because I find the ALJ provided good reasons for the weight assigned to the medical opinions, "deficiency in opinion-writing technique" does not require reversal of the ALJ's decision. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (deficiency in opinion-writing technique that has no bearing on the outcome does not require an administrative opinion be set aside).

[11] Thurman does not challenge the ALJ's decision as it pertains to the form "Report on Incapacity" opinions from Therapist Tatarka and Dr. Penningroth.

9

consistent with the medical evidence and other evidence in the record. Doc. 11 at 9-19. Thurman further argues that even if the ALJ was not required to give Dr. Husman's opinion controlling weight, the opinions of Thurman's treatment team should have been given great weight because the ALJ failed to provide specific reasoning for the weight to assign these opinions, and therefore the case should be remanded for the ALJ to give further consideration to the work-related restrictions provided by Dr. Husman and Therapist Tatarka. Doc. 11 at 19-20.

An ALJ must give "controlling weight" to a treating-source opinion "if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* 20 C.F.R. § 416.927(c)(2). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

As an initial matter, Therapist Tatarka is a licensed mental health counselor and therefore does not qualify as an acceptable medical source whose opinion is entitled to controlling weight. *See* 20 C.F.R. §§ 416.902(a), 416.927(a)(2) (treating source entitled to controlling weight must be an acceptable medical source, which includes licensed physicians and licensed psychologists); 20 C.F.R. §§ 416.902, 416.913(a), 416.927(a)(2) (2015) (same). An ALJ must still consider the opinions of other sources (such as Therapist Tatarka), however, using the following factors:

(1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current 20 C.F.R. § 416.927(c)); *see also* 20 C.F.R. 416. 927(f); Social Security Ruling 06-03p, 71 Fed. Reg. 45593, 45594-45596 (Aug. 9, 2006). The ALJ seems to have considered these factors in weighing Therapist Tatarka's opinion. It appears Dr. Husman qualifies as an acceptable medical source as Thurman's treating psychiatrist; although she had only seen Thurman twice before issuing her opinion, she appears to have taken over Thurman's medication management from Dr. Penningroth. *See* AR 387-89, 432, 435, 437. The ALJ provided specific reasons, which I find are supported by substantial evidence in the record, for not giving great weight to the opinions of Dr. Husman and the rest of Thurman's treatment team.[12]

First, the ALJ noted that both Dr. Husman and Therapist Tatarka believed Thurman has extreme limitations, but that their opinions contradicted one another. AR 19. In particular, the ALJ noted differences in the opinions regarding Thurman's limitations in activities of daily living and concentration, persistence, and pace. *Id*. The record supports this finding:

| Limitation | Dr. Husman | Therapist Tatarka |
|---|---|---|
| activities of daily living | marked | none-mild |
| maintaining concentration, persistence or pace | none-mild | marked |

---

[12] I agree with Thurman's assertion that her providers at Cedar Centre Psychiatric Group (Dr. Penningroth, Dr. Husman, and Therapist Tatarka, AR 47) constitute a treatment team and that their combined records should be considered in evaluating the weight given to the medical opinions in this case. *See Shontos v. Barnhart*, 328 F.3d 418, 426-27 (8th Cir. 2003).

11

AR 378, 385. Although not listed by the ALJ, the record contains additional inconsistencies (albeit not always as significant) between these opinions:

| Ability/Limitation/Issue | Dr. Husman | Therapist Tatarka |
|---|---|---|
| carry out short, simple instructions | unlimited or very good | seriously limited |
| maintain attention for 2 hours | limited but satisfactory | unlimited or very good |
| sustain ordinary routine | limited but satisfactory | seriously limited |
| work with others | unable to meet competitive standards | seriously limited |
| perform at consistent pace | seriously limited | limited but satisfactory |
| accept instruction and criticism from supervisors | unable to meet competitive standards | none (accept instructions), seriously limited (accept criticism) |
| respond appropriately to change in routine work setting | seriously limited | unable to meet competitive standards |
| deal with normal stress | seriously limited | no useful ability to function |
| average number of days absent from work | more than 4 days/month | 3 days/month |
| maintaining social functioning | marked | extreme |
| episodes of decompensation | marked | moderate |
| residual disease process – likely decompensation | box checked | box not checked |
| anxiety related disorder and complete inability to function independently outside home | box checked | box not checked (although notation says can function "for relatively brief periods on a daily basis") |

AR 376-78, 383-85. A finding that an opinion is inconsistent with other evidence in the record is a "good reason" for discounting the opinion of a treating physician, *see Goff*, 421 F.3d at 790, even if other factors weigh in favor of crediting the opinion, such as the fact that it was issued by a treating source, *see Dixon v. Barnhart*, 353 F.3d 602, 606 (8th Cir. 2003), or a specialist, *see Prosch*, 201 F.3d at 1014.

The ALJ next concluded that Dr. Husman's and Therapist Tatarka's opinions "relied quite heavily on [Thurman's] subjective report of symptoms and limitations." AR 19. Dr. Husman opined that Thurman would be seriously limited in responding to change

12

in a routine work setting and dealing with normal work stress and that she would be unable to meet competitive standards of accepting instructions and criticism from supervisors and getting along with coworkers. AR 377. Dr. Husman explained that this was based in part on Thurman's "panic [and] OCD symptom." *Id*. Dr. Husman also believed that Thurman would be absent more than four days per month, although she provided no explanation for that finding. *Id*. Therapist Tatarka found that Thurman's "anxiety prevents her from going places [and] interacting with people" to the extent she would be seriously limited in responding to criticism from a supervisor, that she would be unable to meet competitive standards in getting along with coworkers and responding to changes in routine work setting, and that she would have no useful ability to deal with normal work stress. AR 384. Therapist Tatarka believed Thurman would miss three days of work per month due to anxiety and panic attacks and having to work around other people. *Id*. To the extent these opinions were based on Thurman's anxiety and panic attacks, the opinions are inconsistent with the treatment records and appear to rely on Thurman's subjective complaints (which included her report as part of her application that she suffers panic attacks at least twice per week).

Dr. Penningroth noted in March 2014 that Thurman "continues to have panic attacks[ and] cannot go any place that has people." AR 358. The same date, however, Therapist Tatarka noted that Thurman's anxiety increases "when she is away from home" and "when things come up unexpectedly" but did not mention recent panic attacks nor issues being around people. AR 357; *see also* AR 400-01 (Dr. Penningroth noted in December 2014 that Thurman has panic attacks at times, but one week later, Therapist Tatarka noted only Thurman's issues getting rid of clothing and not panic attacks). Although treatment notes reference ongoing panic attacks, Thurman provided details for only one such occurrence (in January 2014, when she drove on the interstate). AR 361. Since that time, treatment notes contain few reports of panic attacks: in March 2014, April 2014, December 2014, and August 2015. AR 358, 401, 416, 437. Treatment

13

notes from October 2014 and May 2015 refer to panic attacks generally (from prior incidents or as part of Thurman's history). AR 389, 404. Dr. Husman did not mention panic attacks in in June 2015 treatment notes. AR 388. Thurman reported feeling like she might have panic attacks in July 2015, although this appears to have been caused by medication. AR 387. In August 2015, Dr. Husman noted "[s]ome panic attacks," but things appeared to improve in September and November of that year. AR 432, 435, 437. Indeed, the most recent treatment notes in the record do not mention panic attacks (aside from August 2015). AR 432-38. Treatment records from the prior period (which constitute part of the treatment team's records as urged by Thurman) mention panic attacks only three times between 2006 and November 2012. AR 318, 324, 346.

Other portions of the record provide some support for the ALJ's conclusion that the providers relied on subjective complaints to form their opinions. During a mental status examination (MSE) in May 2015, Dr. Husman noted normal results, except that Thurman was "somewhat fidgety," had "some disorganization" in thought process, and appeared nervous (all of which appear to be based on Dr. Husman's observations). AR 389-90. Dr. Husman also noted under mood that "[i]t could be better" and that Thurman's affect was "pleasant but anxiety is my real problem" (which appear to be based on Thurman's reports). AR 390. Dr. Husman made similar MSE notes during Thurman's other visits: "I'm sick of feeling this anxious" for affect in June and August 2015 and "I'm irritable" under mood in August 2015 (AR 388, 437); "I'm still feeling anxious but I am more aware of it" for affect in July 2015 (AR 387); "I'm still feeling anxious at night" for affect in September 2015 (AR 435); and "I'm still feeling anxious but I think it's because of the holidays coming up" for affect in November 2015 (AR 432). Therapist Tatarka's treatment notes also included apparent observations (such as Thurman being nervous or worried), but also information reported from Thurman. *See* AR 391 (often takes son to school late to avoid crowds), 398 (sleep issues due to worrying; "[s]ometimes she is afraid to go to sleep"), 402 ("[s]he reports stress eating

14

with weight gain"), 404 ("feels overwhelmed" and has "difficulty leaving the house"), 413 ("[s]he reports that getting out of the house has been a struggle" followed by MSE notation "increased isolation"), 414 (excessive worrying and "uncomfortable in crowds"), 436 ("[s]he reports feeling a little more relaxed" and worries "especially at bedtime" and "sometimes has difficulty getting to sleep"), 438 ("[s]he notes increased irritability, which she attributes to [medication change]"); *but see* AR 406 (anxious mood and restricted affect), 411 ("somewhat anxious" mood and restricted affect), 413 (increased anxiety). Dr. Penningroth's treatment notes do not include MSE notations, except from Thurman's initial visit in April 2005 (where he noted "friendly cooperative woman" with normal mood and affect and intact memory). AR 325. I take Thurman's point that providers must rely upon a patient's allegations and reports in making mental health diagnoses but note that the opinion in *Flannery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997) (cited by Thurman, *see* Doc. 11 at 19) involved an ALJ's decision to discount a medical diagnosis, not an ALJ's decision to disregard a medical source opinion for relying on subjective complaints (in addition, there was no basis upon which to discredit the claimant's subjective complaints in *Flannery*).

Thurman also argues that the information contained in her treatment team's records constitute objective medical evidence, not subjective complaints. Thurman relies on *Hines v. Colvin*, No. C15-2004-LTS, 2016 WL 538469 (N.D. Iowa Feb. 9, 2016) in making this argument. This case is similar to, although distinguishable from *Hines*: the observed signs and symptoms found to constitute objective medical evidence in *Hines* (such as hearing voices, sleep disturbance, mood disturbance, panic attacks "every once in awhile," and having problems with a neighbor) were likely based on the claimant's reports to the treatment team, while other signs and symptoms (including racing thoughts, appearing upset, poor insight and judgment, talking fast, jumping from subject to subject, and being emotionally reactive) were likely based on the treatment team's observations. *See id.* at *5-7. The ALJ in this case was allowed to give less weight to medical opinions

15

that relied upon Thurman's subjective statements because the ALJ did not fully credit those statements. *See Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017) ("Because the ALJ reasonably concluded that [claimant's] statements lacked credibility, he could discount [the treating source's] opinion to the extent that it relied on [claimant's] subjective complaints."); *Julin*, 826 F.3d at 1085 (holding that the ALJ "permissibly declined to give controlling weight to [the treating doctor's] opinions on [claimant's] work-place limitations" that "relied on [claimant's] subjective complaints" of depression and anxiety when the ALJ had found the claimant not credible).

The ALJ also found that the treatment team's opinions were not substantially supported by the record, including the conservative nature of Thurman's treatment history and GAF scores that showed only moderate symptoms. AR 19. The record supports this finding. Treatment records demonstrate that Thurman was often doing well[13] or improving. AR 359-60 (doing okay), 393 (better month), 395 (doing better, but not great or bad; able to control panic disorder and anxiety "for the most part"), 399 (doing better), 403 (doing okay, panic attacks and anxiety under control), 405 (doing okay, not great or bad). Thurman is often able to calm herself down when she becomes anxious or has a

---

[13] Thurman argues that the DDS consultants (and the ALJ by relying on their opinions) "misinterpreted medical records, equating 'stable' or 'doing well' with 'not disabled.'" Doc. 11 at 23-24. A review of Dr. Penningroth's treatment notes, which range from 2006 to April 2015, show otherwise. Thurman first saw Dr. Penningroth in April 2005 after being referred by the Iowa Department of Human Services for a psychiatric evaluation. AR 324, 389. She reported she began having panic attacks the year before, which doctors first treated as heart issues. AR 324. Dr. Penningroth initially diagnosed Thurman with panic disorder without agoraphobia, and later diagnosed panic disorder with agoraphobia in January 2010, although there is no indication as to why the diagnosis changed. AR 286, 325. Dr. Penningroth's treatment records from April 2005 through November 2012 show that Thurman's primary issues were depression and mood swings (although some phobia and fear were noted in June 2010, AR 281) and that she was generally doing okay with medication (AR 258-325, 329, 333). Based on this history and context, subsequent treatment records (during the relevant time period) showing that Thurman was stable or doing well support the ALJ's decision to not give great weight to the medical opinions.

16

panic attack. AR 357 (self-talk and planning when she goes places help), 361 (calmed herself during panic attack), 396 (logic and self-talk sometimes work), 414 (positive self-talk helps her get through anxiety-provoking situations). Exercise also helps her manage her anxiety. AR 411 (pretty good week, walking almost daily), 413 (not walking as much, increased symptoms), 414 (exercise helping), 417 (walking encouraged and helps with her stress), 435 (walking again and doing fairly well). Thurman also takes medication, and although modified at times, the record shows medication generally helped her symptoms. AR 336 ("[s]he feels they have a good mix with the medication"); 343 ("doing fairly well"), 393 (better month, medication complaint), 399 (doing better over the past month); *see also* AR 333-40, 343-45 (generally stable with no increased symptoms or other issues noted). Most recently, Dr. Husman noted "[s]ome panic attacks" in August 2015 (AR 437), but Thurman seemed improved with no panic attacks reported in September and November 2015 following a change in medication. *See* AR 435 (Thurman did not want to change medication and was "feeling fairly stable" in September), 432 (although stressed, medication was helping without side effects and with no change desired in November). Therapy sessions have also helped Thurman manage her anxiety. AR 350, 360 (psychotherapy going well), 389 (reported therapy is helpful), 416 (seeing psychotherapist helpful although reported continued panic attacks).

As discussed in the previous section, Thurman's GAF scores showed only limited to moderate symptoms. AR 352, 373, 380, 387-88, 390, 432, 435, 437. Those scores are inconsistent with the extreme limitations in Dr. Husman's and Therapist Tatarka's medical source statements. An ALJ may decline to give controlling weight to a physician's opinion where the physician's assigned GAF score contradicts the physician's findings of limitations. *Merritt v. Astrue*, 609 F. Supp. 2d 850, 864-65 (E.D. Mo. 2009) (finding GAF scores of 60 and "60-65" indicated only mild to moderate symptoms and were inconsistent with physician's opinion of marked limitations); *see also Halverson*, 600 F.3d at 931 (collecting cases). In particular, Dr. Husman assessed a GAF score of

17

62 in both May and June of 2015 (AR 373, 388, 390) but opined in June 2015 that Thurman had marked limitations and would be unable to meet competitive standards, including missing work more than four times per month (AR 376-78). Inconsistencies between the opinions and the GAF scores contained in their treatment notes provided a good reason for the ALJ to decline to give great weight to Dr. Husman's and Therapist Tatarka's opinions.

The ALJ also considered the RFC opinions of Dr. Lark and Dr. Shafer, the DDS non-examining consultants.[14] AR 19. Dr. Lark found that Thurman has only mild limitations in her abilities to engage in activities of daily living, to maintain social functioning, and to maintain concentration, persistence, and pace, and that her mental impairments cause only non-severe functional limitations. AR 67-68. Accordingly, Dr. Lark made no RFC determination. *See* AR 69. Dr. Shafer found moderate limitations in Thurman's abilities to remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform within a schedule, be punctual, and maintain attendance; work in coordination or proximity to others; complete a normal work day without interruption from psychologically based symptoms; perform at a consistent pace; accept instructions and criticism from supervisors; get along with coworkers; respond to work-setting changes; and travel in unfamiliar places. AR 80-81. Dr. Shafer also found that Thurman has marked limitations in her ability to interact with the general public. AR 80. He concluded that Thurman's ability to maintain attention, concentration, and pace "are adequate for routine tasks not requiring sustained attention

---

[14] The ALJ refers to the "conclusions reached by the [DDS] physicians" (plural), notes that the examiners' opinions (plural) were internally consistent, and concludes the opinions (plural) were entitled to substantial weight. AR 19. During the initial review, Dr. Lark provided opinions about the severity of Thurman's medically determinable impairments and whether those impairments meet or equal any applicable Listing but made no RFC assessment. *See* AR 67-69 (noting "[n]o RFC/[mental]RFC assessments are associated with this claim"). Accordingly, I will disregard Dr. Lark's opinion and consider only the ALJ's review of Dr. Shafer's opinion.

18

or extensive contact with others," that she can "interact appropriately with known coworkers and supervisors on at least a limited basis," and that she can adjust to workplace changes with supportive supervision. AR 80-81. Thus, Dr. Shafer found that Thurman could perform routine tasks that do not require sustained attention and involve limited contact with others. AR 81-82.

The ALJ found these conclusions were entitled to substantial weight because they were "well supported with specific references to medical evidence" and were "consistent with the evidence as a whole.[15] *Id.* Because the ALJ gave a good reason for declining to give great weight to Dr. Husman's and Therapist Tatarka's opinions, the ALJ could properly assign greater weight to RFC opinions from non-treating, nonspecialist sources. *See Ponder v. Colvin*, 770 F.3d 1190, 1194-95 (8th Cir. 2014) (concluding that the treating physician's RFC opinion "cannot trump" three non-examining consultants' opinions "solely because he was [claimant's] primary care physician" when his opinion was inconsistent with claimant's daily activities and contemporaneous treatment records); *see also Vance*, 860 F.3d at 1121 (holding that when the ALJ gives a good reason for discounting a treating physician's opinion, the ALJ may "rely instead on the opinions of the state agency medical consultants," as long as those opinions are "more consistent with the medical evidence").[16]

---

[15] The ALJ's decision, especially in regard to the weight given the DDS opinions, consists largely of "a series of generalized statements" and "boilerplate language" without specific or extensive citation to the record. *See Hines*, 2016 WL 538469, at *5-6 (finding the ALJ's boilerplate reasoning for the weight given to state agency opinions "meaningless" but noting "[t]he ALJ did not even bother to state that the consultants' opinions [we]re consistent with . . . the record as a whole"). I find, nevertheless, that the ALJ provided adequate reasons and explanation for his findings.

[16] Thurman also relies on *Allen v. Astrue*, 534 F. Supp. 2d 923, 929 (S.D. Iowa 2008), to argue the ALJ did not make a reasonable choice among the available medical opinions. That case, however, is distinguishable because the court in *Allen* found that the ALJ improperly weighed treating-source medical opinions (including from a state agency psychologist and claimant's treating psychiatrist). *Id.* at 928-29.

### C. Some Medical Evidence

Thurman argues the ALJ's RFC determination is not supported by substantial evidence from a treating or examining source. Doc. 11 at 22-25. When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ's RFC determination must be supported by at least some medical evidence that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).

Thurman argues the ALJ failed to properly develop the record because the ALJ's RFC determination is not supported by the opinion of a treating or examining medical source and relies on *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000) and *Strongson v. Barnhart*, 361 F.3d 1066 (8th Cir. 2004). Those cases require the ALJ to develop the record to ensure it contains an opinion from a treating physician or consultative examiner about the functional limitations caused by a claimant's impairments; the ALJ cannot rely on only the opinions of non-treating, non-examining sources in forming an RFC determination. *Strongson*, 361 F.3d at 1071-72 (discussing *Nevland*); *Nevland*, 204 F.3d at 857-58. Here, however, the record contains RFC opinions from Thurman's treating providers (although the ALJ assigned these opinions little weight), and as discussed in the preceding sections, the ALJ conducted an independent review of the medical evidence to formulate an RFC consistent with the treatment records and with the DDS consultant's opinion.[17] Some medical evidence thus supports the ALJ's RFC determination. *See*

---

[17] Dr. Shafer opined that Thurman suffered from marked limitations in her ability to interact with the general public. AR 80. He also found that she suffered from moderate limitations in other categories but could ultimately perform "routine tasks not requiring sustained attention" and "interact appropriately with known coworkers and supervisors on at least a limited basis." AR 80-81. Thurman argues that Dr. Shafer's opinion is not consistent with the ALJ's RFC

20

*Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ assigned little weight to the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"); *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) (rejecting claimant's argument "that the ALJ should not have based his decision upon the opinions of" non-examining medical consultants when their opinions "were consistent with the administrative record," and the ALJ gave good reasons for discounting the treating physicians' RFC opinion); *Stormo v. Barnhart*, 377 F.3d 801, 806-807 (8th Cir. 2004) (holding that some medical evidence supported the ALJ's physical RFC determination when it was consistent with the state agency medical consultants' opinions, and at least one treating physician's physical RFC opinion was in the record but assigned non-controlling weight); *see also Symens v. Colvin*, No. CIV 13-3006-RAL, 2014 WL 843260, at *26 (D.S.D. Mar. 4, 2014) (holding that remand is not required under *Nevland* when "the ALJ engaged in an extensive review of the medical evidence. . . . [that] supported the ALJ's" RFC and "was also consistent with the reports from the" nonexamining state agency consultants). Also, the ALJ did not completely discount the opinions from Dr. Husman and Therapist

---

determination because the ALJ limited only her ability to interact with coworkers, not supervisors. Doc. 11 at 22. Although this argument may have merit on a different record, *see, e.g.*, *Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004); *Wood v. Astrue*, No. 1:11-CV-3198-JSA, 2012 WL 5507330, at *4-7 (N.D. Ga. Nov. 14, 2012); here, it is clear that the ALJ's limitation on Thurman's ability to interact with coworkers included supervisors, as the relevant hypothetical to the VE explicitly limited Thurman to "only occasional contact with coworkers or supervisors" (AR 58). *See also* AR 58-60 (VE testified that jobs as a laundry worker or janitor involve work that can be done in in non-public settings, such as in the evening, and are fairly isolated and not highly managed). For this same reason, even if the ALJ erred in failing to explicitly note in the opinion that Thurman was limited in her ability to interact with supervisors, any error was harmless. *See Hann v. Colvin*, No. 12-CV-06234-JCS, 2014 WL 1382063, at *21-24 (N.D. Cal. Mar. 28, 2014).

Tatarka, nor Thurman's subjective complaints; the RFC determination included limitations in Thurman's ability to interact with others. *See Julin*, 826 F.3d at 1089 (holding that some medical evidence supported the ALJ's RFC determination when the ALJ adopted some of the limitations set forth by the treating physician, but not those limitations "premised on [claimant's] subjective complaints"); *see also Anderson v. Shalala*, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; adopted some, but not all, of the limitations set forth by the treating physicians; and "conducted an independent analysis of the medical evidence").

The record contained sufficient information for the ALJ to determine Thurman's functional limitations, and the ALJ's RFC determination is supported by some medical evidence.

### III.   CONCLUSION

I recommend that the district court judge **affirm** the decision of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 28th day of June, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa